## FLINTKOTE CO. v. NATIONAL ASBESTOS MFG. CO.

### No. 4404.

Circuit Court of Appeals, Third Circuit.

Oct. 10, 1931.

Dean S. Edmonds and Leslie B. Young, both of New York City, for appellant.

Dean, Fairbank, Hirsch & Foster, of New York City (Clair W. Fairbank, E. W. Marshall, and S. A. Demma, all of New York City, of counsel), for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and THOMPSON, District Judge (now Circuit Judge).

THOMPSON, Circuit Judge.

This is an appeal from a decree dismissing a bill in equity charging infringement by the defendant of two patents owned by the plaintiff: No. 908,125, granted December 29, 1908, to Frederick C. Overbury and as-

signed to Flintkote Company, plaintiff; and No. 1,410,018, granted March 21, 1922, to the plaintiff upon the application of O. P. Kiracofe.

The Overbury patent contains two claims and the Kiracofe five claims, all of which were alleged to have been infringed by the defendant. The Overbury patent relates to the manufacture of shingle strips for roofing, composed of flexible waterproof material, and adapted to be laid in overlapping courses, each strip constituting a member of the covering of a roof or other surface of a building. The Kiracofe patent relates to a machine by which the shingle strips are cut from the web of waterproof material. The history of the branch of the roofing industry which lead to the application for the Overbury patent is well stated by the trial judge and supported by the evidence as follows:

"In or about the year 1907, when the Overbury patent made its appearance, the principal form of prepared or artificial roofing, as distinguished from wood, slate, or tin, came in long rolls of specially treated paper or felt, and these rolls were laid in successive rows, each one partially covered by the overlapping of the next higher row, and the overlapping edges held together either by cement or nails.

"The Overbury aim, in part at least, seems to have been to provide artificial roofing which should have more durability and more attractiveness than had theretofore been evolved, and to that end offered several inventions, one of which contemplated a roll of roofing material, straight on each lengthwise edge but cut lengthwise along the approximate center of the roll in half diamond design.

"This operation purposed as a result two rolls, each one-half as broad as the original roll, and susceptible of being superimposed one upon the other in such form as to produce a full diamond design. This, together with the furnishing of the rolls in different colors, contemplated a form of roofing calculated to interest a public concerned with the roofing of residences and public buildings.

"To this new style of roofing, plaintiff in its exploitation thereof, gave the name of Zolium, and while the product developed many shortcomings, it attained a market of considerable size.

"While there had been other patents granted for prepared roofing, there were none, apparently, which had been able to meet commercial demands, or which were being sold in the open market.

"In consequence, the only two forms in which prepared roofing appeared in or about 1907 in any practical commercial sense were as the long uncut roll and as the so-called Zolium.

"It was during this period that one of the patents in suit, Overbury No. 908,125, made its appearance, proposing a new form of roofing element, to consist of a square-butt strip-shingle, accomplished by cutting lengthwise in a web of flexible waterproof material a series of slots arranged in line, and then cutting the web along a line intersecting the slots of the series, thus forming two strip-shingles from the web, each having notches at intervals along one edge formed by slots cut in the web. The strip when laid in place gave the appearance of several individual shingles secured together with spaces between the butts."

The two claims of the Overbury patent are as follows:

"1. A shingle strip blank composed of an elongated sheet of flexible water-proof material, having transverse slots between its edges, the ends of the slots being between the edges of the sheet so that said edges are continuous, said blank being adapted to be converted into two operative shingle strips by severing it lengthwise between the ends of the slots.

"2. A shingle strip blank of indeterminate length composed of an elongated sheet of flexible water-proof material, having transverse slots between its edges, the ends of the slots being between the edges of the sheet so that said edges are continuous, said blank being adapted to be converted into two operative shingle strips of either the full length of the blank or of lesser length by severing it lengthwise between the ends of the slots."

The District Court concluded that Overbury's original disclosure, as shown in the specifications and claims, was broader than in the patent as issued, and that the patent as issued was for a shingle strip blank possessing no utility within itself, except as it might be altered to form something not covered by the patent, because, before the blank could be used, it would have to be severed lengthwise midway between the ends of the slots. Under those circumstances, the patent was held void for want of utility.

It is true that the sheet or blank of the Overbury patent is not susceptible of use in the form in which it is produced. In claim 1, however, the concluding clause is: " * * * Said blank being adapted to be converted into two operative shingle strips by severing it lengthwise between the ends of the slots." And in claim 2 the concluding

clause is: "* * * Said blank being adapted to be converted into two operative shingle strips of either the full length of the blank or of lesser length by severing it lengthwise between the ends of the slots." As a blank, without being cut through the slots in order to obtain the effect of shingle formation, it was undoubtedly of no practical use.

While Overbury's claims are for the blank with the transverse slots adapted to be slit, and while, before slitting, the blank was not in a condition for practical use, it was an article of manufacture which Overbury contemplated that builders or wholesalers or retailers might buy, and they or the user, by slitting it longitudinally through the slots, would have two lengths of simulated shingle roofing. Utility in a patent does not require that the product, in itself and apart from any application of commonly known means, be in a condition for practical use. True, the patentee is bound to disclose a mode in which his invention may be rendered practically useful, but it may be one of many modes, and it may necessarily involve the use of other known devices which may be required in order to effect the useful result. Wheeler v. Clipper Mower, etc., Co., 29 Fed. Cas. 881, No. 17,493. The claims disclose a mode in which the blank may be put to practical use.

There is persuasive evidence in the case of the commercial success of the patented device which is strong evidence in itself of utility. Additional evidence of its utility is in the fact that the defendant has used the invention. Sandy MacGregor Co. v. Vaco Grip Co. (C. C. A.) 2 F.(2d) 655. The defendant contends, however, that it has not infringed, because the sheet delivered to its machine is of a width equal to four shingle strips instead of two as defined in the patent in suit; that no blank is produced which is adapted to be converted into shingle strips; and that it cuts the web transversely to make short strips which may be stacked. It adopts the same arrangement of slots shown in the drawings of the Overbury patent, and in the plaintiff's manufacture under the patent, and uses the blank in multiple form, placing three rows of slots in the length of the fabric. The center slot is toward the length of the exposed part of the shingle. To the right and left of this are smaller slots exactly the length of the exposed part of the shingle. The entire fabric contains the double length slot of Overbury and additional single length slots in rows, adapted, as in the Overbury blank, to have the center slots cut in the center and the slots on the inner or outer row cut on the edge. When the slots are cut transversely in a long piece of fabric, all of the elements of the Overbury blank are produced. The fact that the defendant does not take the blank out of the slot-cutting machine, but cuts the slots in the machine which produces the blanks, is immaterial, for during its process of manufacture it has used the Overbury blank.

An infringer seldom copies a patented article in every detail. If he did, there would be no question of infringement. Problems arise when variations in form are used either with intent to conceal the infringement or by inadvertence. Where form and substance are inseparable, it is enough to look at the form only. Where they are separable, where the whole substance of the invention may be copied in a different form, it is the duty of the courts and juries to look through the form for the substance of the invention—for that which entitled the inventor to his patent, and which the patent was designed to secure; where that is found, there is an infringement; and it is not a defense that it is embodied in a form not described and in terms not claimed by the patentee. Winans v. Denmead, 15 How. 330, 14 L. Ed. 717. See, also, Ives et al. v. Hamilton, 92 U. S. 426, 23 L. Ed. 494; Overman Cushion Tire Co. v. Goodyear Tire & Rubber Co. (C. C. A.) 40 F.(2d) 460; Allis-Chalmers Mfg. Co. v. Columbus Electric & Power Co. (C. C. A.) 19 F.(2d) 860.

All essential elements of the Overbury patent are duplicated in the process of manufacture of the defendant. Our conclusion is that the court erred in finding the patent in suit invalid.

The Kiracofe patent No. 1,410,018, the second patent in suit, is for a roofing machine for making the same class of shingle strips described in the Overbury patent, discussed above. As to the Kiracofe patent, the defenses were nonvalidity and noninfringement. The learned District Judge concluded, upon a review of the prior art, that, while it disclosed many slot-cutting machines, it failed to show any one which accomplishes its purpose in the fashion adopted and shown by Kiracofe, namely, through the making of two parallel transverse cuts at one point and two parallel longitudinal cuts at another point, the ends of the said pairs of cuts meeting and completing the four-sided incision.

The only patents cited which showed a "two-station" cutting of the slots are the Overbury patents No. 1,182,416 and No. 1,-182,417. Overbury, however, does not employ the two-station principle in the same manner as Kiracofe. In cutting his longi-

722

tudinal slits, he shows cutting by means of a die so constructed in form as to cut into the sheet pairs of longitudinal slits of the same length connected at their rear ends by cross slits so as to leave tongues attached at one end to the body of the sheet. After leaving the feeding rolls, the sheet is severed transversely by a chopping knife, the line of the cut extending across the attached ends of the tongue so as to completely detach them from the sheet and the shingle strip. So far as the "two-station" principle is concerned, that described by Overbury is in no sense similar to that of Kiracofe. In the Kiracofe machine, the end slits of the slot are cut at one station, and the sheet then moves forward and the two-side cuts are made, thereby completing the slot.

The District Judge, in his opinion, has clearly shown that the Kiracofe patent was not anticipated by Spiegel, Nos. 1,110,133 and 1,301,332; Gardner, No. 1,191,297; Cunifer, No. 1,257,321; and Wyman, No. 1,263,987. It is unnecessary to deal further with the discussion of the court below upon the question of validity, and upon that subject we agree with its reasoning and conclusion.

In the opinion a distinction is drawn between the types of cutters used in the Kiracofe and Langston machines and also between the means used in the two machines for disposing of the waste pieces from the cut-out strips. We do not find it necessary to determine whether these devices are equivalents. The main ground of the decision that infringement does not exist is based upon the following discussion, which we quote:

"As one reads the Kiracofe patent, the restricted scope of its intended range becomes apparent, and this showing is emphasized when it appears, not only that the purpose of the patent was to effect improvement in the machine designed for the making of cross-cut strips, but is silent as to showing any capability for cutting other types of strips, either directly or through any modification of the construction permissible within the scope of the invention.

"As illustrative of the fact that the patent is intended to serve and is designed to constitute an improvement in the crosscut machine, the following from the specifications is pertinent:

" 'In making crosscut shingle strips, so called, in which the strips are successively severed from the end of the advancing sheet, it has become customary to cut transverse spaced rows of longitudinal slots in the sheet, and to sever the strips on lines intersecting the slots of each row.

" 'The formation of such slots produces oblong waste pieces which are apt to be carried along with the sheet and to be mixed with the strips, or to clog the rolls or cutters and halt the operation of the machine.'

"Further on comes another specification, which emphasizes the fact that it is a crosscut mechanism with which the patent deals. It reads as follows:

" 'The slot-forming mechanism, which forms a part of the present invention comprises two sets of cutters, one set operating to cut spaced transverse cuts or slits in the sheet to form the ends of the slots, and the other set operating to cut parallel longitudinal slits or cuts in the sheet to form the sides of the slots.'

"Both types of machine, the crosscut and the lengthwise cut varieties, were well known at the time of the Kiracofe patent, and it therefore becomes evident, in view of the language employed under these circumstances, that it was used intentionally, and that by design it was restricted to machines of the crosscut variety.

"The claims in various stages confirm this conclusion, as where, for instance, they define the arrangement of cutters as being such that 'a series of longitudinal slots are formed.'

Claim 3 goes to a greater and more specific extent, in that it calls for the making of the roofing elements by combining with the specified slot-forming cutters 'means for severing said sheet transversely.'

"This makes it clear that the means for severing limit the claim to a machine of the type in which the strips are cut transversely because in machines of the longitudinal type, such as shown in Spiegel, 1,110,238, Gardner, 1,191,297, and Cunifer & McFarland, 1,257,321, no means appear for cutting the sheet transversely, while in defendant's machine it is the longitudinal slitters which form the shingle strips or roofing elements, and not the transverse cutting means. * * *

"Indeed, and in conclusion, a reading of the entire set of specifications and claims shows, in the first place, that they were directed definitely and specifically to machines of the crosscut type. And, with such further differences as are therein shown, the situation may be summed up by saying that, inasmuch as the defendant's machine cuts the strips lengthwise, and not crosswise, as does the plaintiff's, and does not form longitudinal slots, as does the plaintiff's, and does not include a type of cutter which can be used with the crosscut strip, as does the plaintiff's, and utilizes pins, expedients only though they be, rather than cutters, for the removal of the

cut-outs from the sheet, and strips these cut-outs from pins rather than from cutters, there is clearly such a difference in principle, construction and method between the two machines as to avoid any charge of infringement.

"These conclusions appear inevitable in the light of any reasonable reading of the claim and specifications, which in their limitations bear the evidence of deliberate design. Having elected and set limitations to the field intended to be covered by the patent grant, there can be no protection afforded beyond the limits.

" 'The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification. These so mark where the progress claimed by the patent begins and where it ends that they have been aptly likened to the description in a deed, which sets the bounds to the grant which it contains. It is to the claims of every patent, therefore, that we must turn when we are seeking to determine what the invention is, the exclusive use of which is given to the inventor by the grant provided for by the statute,—"he can claim nothing beyond them." ' Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U. S. 502, 37 S. Ct. 416, 418, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959."

We perceive no error in the court's reasoning and conclusions that the Kiracofe patent is valid and that the charge of infringement is not sustained.

The decree of the court below is reversed, and it is ordered that a decree be entered holding the Overbury patent valid and infringed, with an accounting, and holding the Kiracofe patent valid but not infringed; costs on this appeal to be assessed equally against the contesting parties.