810

## P. R. MALLORY & CO., Inc., v. AUTOMO-TIVE MFRS' OUTLET, Inc.

District Court, S. D. New York.
Feb. 10, 1930.

Warfield & Watson, Lawrence Bristol, and Donald L. Brown, all of New York City, for plaintiff.

Kiddle, Margeson & Hornidge, Henry T. Hornidge, and Wylie C. Margeson, all of New York City, for defendant.

GODDARD, District Judge.

This is a suit for alleged infringement of United States letters patent No. 1,089,907, dated March 10, 1914, issued to William D. Coolidge, assignor to the General Electric Company, for an "electrical contact." The original application for the petition was filed December 17, 1912, as a division of an orig-inal application filed March 20, 1912. The patent, together with the right to sue and collect any damages by reason of past in-fringements, was assigned on August 17, 1925, by the General Electric Company to the Elkon Works, Inc., in which name the suit is instituted. In the interval between the institution of the suit and trial, plain-tiff's name was changed to Elkon, Inc., and the suit duly continued under the plaintiff's new name.

The defenses set up are want of necessary parties plaintiff, invalidity, infringement, laches.

The patent in suit concerns the construc-tion of electrical make-and-break contacts. Its purposes as defined in the patent are as follows:

"My invention relates to electrical con-tacts, particularly for rheotomes or other vibratory circuit making and breaking de-vices, ordinarily used as sparking or ignit-ing contacts for gas-engines, as circuit con-trollers, for regulators, and for other like purposes."

There are seven claims in the patent, all of which are alleged to be infringed, reading as follows:

"1. An electrical make-and-break con-tact of tungsten.

"2. An electrical make-and-break contact of malleable tungsten.

"3. An electrical make-and-break contact of tungsten, and a backing for the same of a metal of superior electric and thermal conductivity intimately joined thereto.

"4. An electrical make-and-break contact of tungsten integrally joined to a metal back-ing of superior electric and thermal conduc-tivity.

"5. An electrical make-and-break contact of tungsten, a support for the same and a contact backing of a metal of superior electric and thermal conductivity intervening be-tween the contact and support and integrally joined to both.

"6. An electrical vibratory make-and-break contact of tungsten.

"7. An electrical make-and-break impact of tungsten."

Just what problem Coolidge attempted to solve and his solution of it is best set forth in the specification of his patent, which reads as follows:

"In apparatus of this character, vibra-tory contact terminals of expensive metals, such as platinum and iridium, have hereto-

fore been used, and it was found that these contacts deteriorated and became destroyed, so as to be unfit for further use, within a comparatively short time. The contacts were found to blacken and pit; their contacting surfaces became deformed by the continuous hammering action and by the formation of irregular and variably distributed small protuberances due, probably, to the transference of material from the cathode to the anode, whereby the normal distance between the contacts was reduced and 'bridges' were often formed between the two contacts. It was also found that the accidental wetting of the contacts with oil seriously interfered with their operation. In addition to this, the materials heretofore used for vibratory contacts are softened by the heat of the sparks passing between them, to such an extent as to cause welding, or incipient welding."

"My invention is designed to overcome these difficulties and it consists broadly in make and break contacts of metallic tungsten, preferably in the wrought or malleable form.

"It is a well-known fact that tungsten, when heated to redness in air, is soon covered with a layer of oxid which is practically an insulator, especially in the cold state, and this property of tungsten would seem to make this material unfit for use as contacts. But I have found by experiment that this is not so, and that by reason of the light powdery or flocculent condition of the oxid, the same is shaken off almost as quickly as it is formed, so that vibratory contacts of tungsten, and especially of wrought or malleable tungsten, can be used with great advantage.

"I have found that the pitting of the contacts made of tungsten, while theoretically not absent, is practically insignificant; that the normal distance between the contacts remains sensibly constant during a long period; that no welding or incipient welding of the contacts occurs, and that the presence of oil on the contact surfaces does not interfere with their operation. In consequence of these properties of tungsten which I have ascertained by long continued experiments, contacts of this material have a very much longer life than contacts made of any other material known to me, or of any material that has heretofore been used.

"In a comparative test, I have found that a pair of tungsten contacts, after having made thirty-two millions of makes and breaks, were still clean and symmetrical, and apparently as good as new; while a pair of platinum contacts operated under the same conditions and with the same number of makes and breaks, were found to have become so badly pitted, consumed and deformed as to be unfit for further use.

"One of a pair of contacts is usually mounted on a resilient support, such as a spring, and the other to a rigid support, and the joinder between the contacts and supports should be very intimate so that the contacts will not become loose by the hammering action to which they are subjected. I secure this result either by fusing to one face of the tungsten contact a backing of a rather bulky piece of a metal of superior conductivity for heat and electricity, such as copper, silver or gold, and fasten the backing to a spring or rigid support by screws or other mechanical means; or I interpose the backing of superior conductivity between the contact and the support by fusion to both, that is to say, by using the backing as a solder. In either case, the heat generated in the contact is carried away rapidly."

Before proceeding to the consideration of the validity and the infringement of the patent, the defendant's motion to dismiss the bill for failure to include the necessary parties plaintiff should be disposed of. The bill of complaint contained the following allegation as to title: "Plaintiff, Elkon Works, Inc., has by mesne in writing, duly executed, delivered and recorded in the United States Patent Office, acquired and is now possessed of all the right, title and interest in said invention of said Letters Patent No. 1,089,907 * * * and plaintiff is entitled to all the benefits thereof." The answer put this allegation in issue. As proof of this title, plaintiff, at the trial, offered in evidence an alleged assignment of the General Electric Company, the patentee, of letters patent No. 1,089,907 (Plaintiff's Exhibit 2). The alleged assignment from the General Electric Company to plaintiff (Plaintiff's Exhibit 2) purports to "assign, transfer and set over to Elkon Works, Inc. * * * (the patent in suit, among others) * * * as fully and entirely as the same would have been held and enjoyed by said General Electric Company had this assignment not been made, together with claims for damages by reason of past infringement of said patents, with the right to sue for and collect the same for its own use, but subject to all rights and licenses, exclusive and non-exclusive, which the General Electric Company has heretofore granted or agreed to grant under said patents." The agreement continues with an explanation as to what those exclusive or

nonexclusive licenses may cover, and contains the provision "that said Elkon Works, Inc. receives no right whatever under said patents * * * for any illumination, radio, or any communication purposes or for use in or in connection with domestic hearing devices." The agreement also contains a reservation to General Electric Company of a full, free, and nonexclusive license to make, use, and sell make-and-break tungsten contacts, the reserved right to sell being restricted to sales of contacts incorporated in apparatus manufactured and sold by General Electric Company and to replacement parts for said apparatus.

As explanatory of the outstanding rights, plaintiff offered in evidence an agreement entered into between the General Electric Company and the Radio Corporation of America, dated November 20, 1919 (Plaintiff's Exhibit 26) and the American Telephone & Telegraph Company dated July 1, 1920 (Plaintiff's Exhibit 27).

Without setting forth at length in precise detail the exact limited fields, it will be sufficient, for the purpose, to state that from an analysis of the agreements entered into between the General Electric Company, the Radio Corporation of America (Plaintiff's Exhibit 26), and the General Electric Company's agreement with the American Telephone & Telegraph Company (Plaintiff's Exhibit 27), to which the alleged assignment of the General Electric Company to the plaintiff was subject, it appears that it conveyed to the Radio Corporation of America the exclusive right to use and sell in the radio field and that the General Electric Company and the Westinghouse Electric & Manufacturing Company, together have the exclusive right to make, and that the American Telephone & Telegraph Company has the exclusive right to make, use, and sell in certain limited fields primarily the limited fields of wire and wireless telephony, provided the tungsten used by the American Telephone & Telegraph Company be purchased from the General Electric Company. It also appears that the General Electric Company has reserved to itself a personal nonexclusive license for all purposes in addition to such rights as are reserved to it in the radio field.

The defendant contends: (1) That Plaintiff's Exhibit 2 was not an assignment, but a mere license to the plaintiff; (2) that the plaintiff may not maintain this suit without joining the General Electric Company, Radio Corporation of America, and the American Telephone & Telegraph Company.

In the course of the trial, and before the plaintiff had rested, counsel for plaintiff stated definitely that he did not desire to move to amend the pleadings, so as to bring in the Radio Corporation of America, the American Telephone & Telegraph Company, and the General Electric Company, or either of them, as parties plaintiff, and no request has been made by either of them to join as a party plaintiff, they apparently take the position that they have no interest in the present litigation, as it involves an alleged infringement in fields with which they are not concerned.

The business of the defendant, as its corporate name indicates, appears to be related solely to the automotive industry, and its catalogues refer only to tungsten contacts for automobile ignition systems, and the three exhibits of the alleged offending device are all electrically make-and-break contacts, designed and intended for use in connection with automobile ignition systems. There is no proof that the defendant has dealt in contacts adapted to use in other fields.

It seems to me clear that none of those referred to above are indispensable parties plaintiff unless they are necessary for the purpose of having the entire title to the patent before the court though, of course, no relief or damages could be awarded them; but as the proof now stands, they have suffered no damage and apparently have no interest in the result of this suit, for the field which this plaintiff claims the defendant has invaded is outside of their domain. And the questions presented are whether the plaintiff's title to the patent is such as to enable it to sue for infringement and whether exclusive licensees in certain limited fields are indispensable as parties plaintiff where the infringement complained of is in a field in which the exclusive licensees have acquired no rights.

While it is settled that a mere licensee must include the patentee as a party plaintiff in a suit for infringement, except in certain cases where the patentee himself is the infringer, there does not seem to be any reason why a patentee alone may not bring suit for an infringement, even in equity, if the rights of the licensee are not involved. Whether it is necessary to include as a party plaintiff in an equity suit a licensee must depend on whether or not the licensee's interest is affected.

Generally, there is a good reason for including as a party plaintiff in an equity suit a licensee, as in many instances the licensee's

as well as the patentee's rights have been infringed.

In Waterman .v. Mackenzie, 138 U. S. 252, on page 255, 11 S. Ct. 334, 335, 34 L. Ed. 923, it is stated: "In equity, as at law, when the transfer amounts to a license only, the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone unless that is necessary to prevent an absolute failure of justice, as where the patentee in the infringer, and cannot sue himself. Any rights of the licensee must be enforced through or in the name of the owner of the patent, and perhaps, if necessary to protect the rights of all parties, joining the licensee with him as a plaintiff."

In Radio Corporation v. Emerson (C. C. A.) 296 F. 51, 55, certiorari denied, 265 U. S. 582, 44 S. Ct. 456, 68 L. Ed. 1190, Judge Manton, speaking for the Circuit Court of this circuit, states: "In suits for infringement for invasion of the fields covered by these licenses, the appellants could, in equity, properly plead the absence of the Radio Corporation as a party." The clear inference from this statement is that, if the infringement was not for an invasion of the field covered by the particular licenses, such licensee would not be a necessary party.

In Independent Wireless Co. v. Radio Corporation, 269 U. S. 459, 466, 46 S. Ct. 166, 168, 70 L. Ed. 357, Mr. Chief Justice Taft, stated: "Indeed both the owner and the exclusive licensee are generally necessary parties in the action in equity."

"A licensee of a patent cannot bring a suit in his own name, at law or in equity, for its infringement by a stranger; an action at law for the benefit of the licensee must be brought in the name of the patentee alone; a suit in equity may be brought by the patentee and the licensee together. Gayler v. Wilder, 51 U. S. [10 How.] 477, 495 [13 L. Ed. 504]; Littlefield v. Perry, 21 Wall. 205, 223 [22 L. Ed. 577]; Paper Bag Cases, 105 U. S. 766, 771 [26 L. Ed. 959]." Birdsell v. Shaliol, 112 U. S. 485, 486, 5 S. Ct. 244, 245, 28 L. Ed. 768.

From the statements of Mr. Chief Justice Taft, in the Independent Wireless Co., and that of Mr. Justice Gray in Birdsell v. Shaliol, it appears that a licensee "may be" made a party plaintiff and "generally" is an indispensable party plaintiff, but not always so. In most cases, a licensee is a necessary party plaintiff because its interest is affected, but I think it is a fair assumption that, if its rights are not affected, as

for instance, where a licensee holds a license for a particular field and that field is not invaded, then such licensee would have no interest in the action and would not be a necessary party.

In Bowers v. Atlantic, Gulf & Pacific Co. (C. C.) 162 F. 895, 899, the court stated:

"Addressing ourselves to the question whether the Bowers Southern Dredging Company [the exclusive licensee] is a necessary or proper party to this suit, it may be said that, as a rule, where the courts have decided that an exclusive licensee for any purpose was not a 'proper' party to a suit in equity for the infringement of a patent under which the licensee claimed, it was apparently because no interest of the licensee could be affected by the decree. * * *

"In considering the question whether the Bowers Southern Dredging Company ought to be made a party to this proceeding for any purpose, we are left in some doubt by the authorities. That it is beneficially interested in the litigation is both admitted by the bill itself and also appears from averments therein anticipative of the defense made by the plea, and from similar averments in the plea. However, under all the authoritative decisions that I have been able to find, the matter resolves itself now to a question addressing itself to the sound discretion of the court under general equity principles. * * *"

"An exclusive licensee need not ordinarily be joined as a complainant with the patentee." Foster on Federal Practice (6th Ed.) vol. 1, p. 689.

See, also, Frost's Patent Law and Practice (3d Ed.) vol. 11, p. 156; Blair v. Lippincott Glass Co. (C. C.) 52 F. 226; Sechler Carriage Co. v. Deere & Mansur Co. (C. C. A.) 113 F. 285.

While there are a number of cases holding that an exclusive licensee must be included as a party plaintiff, it was undoubtedly upon the theory that an exclusive licensee had exclusive equitable rights in the matter or field involved which the equity court sought to protect. Even though one be an exclusive licensee if the license is limited to a particular field, territorially or commercially, and is not claimed to be invaded, such licensee is not affected and no good purpose would be served by forcing it to become a party plaintiff. The licensees in the case at bar ask nothing from the defendant, and obviously it cannot be said that the defendant is greatly prejudiced. There is no more reason for holding that an exclusive licensee for a limit-

ed commercial field is an indispensable party than that an exclusive licensee in a limited territorial field is an indispensable party.

In Consolidated Rubber Co. v. Goodrich (D. C.) 237 F. 893, affirmed (C. C. A.) 251 F. 617, exclusive licensees for limited territories were not joined. The suit was sustained by the court which granted an injunction and account, but denied recovery of damages to licensees. See, also, Brookfield v. Novelty Glass Mfg. Co. (C. C. A.) 170 F. 960.

In Daimler Mfg. Co. et al. v. Conklin (C. C.) 145 F. 955, Judge Hazel held that a licensee was properly made a party plaintiff because the licensee appeared to have exclusive rights in the territory specified. See, also, Russell v. Kern (C. C.) 58 F. 382; Wilson v. Rousseau, 45 U. S. (4 How.) 646, 686, 11 L. Ed. 1141; Green v. LeClair (C. C. A.) 24 F.(2d) 74; Moore v. Marsh, 74 U. S. (7 Wall.) 515, 521, 19 L. Ed. 37.

In Nellis v. Pennock Mfg. Co. (C. C.) 13 F. 451, 455, where the owner of the patent had granted the exclusive right under it to manufacture and sell a particular machine containing improvements covered by the patent, it was stated that:

"Under all the decisions, the representatives of such an interest are not indispensable parties to a suit upon the patent. Nor are they even proper parties here, because the decree asked for will not affect their interests. * * * "

"The general rule as to parties in chancery is, that all ought to be made parties who are interested in the controversy, in order that there may be an end of litigation. But there are qualifications of this rule arising out of public policy and the necessities of particular cases. The true distinction appears to be as follows: First. Where a person will be directly affected by a decree, he is an indispensable party, unless the parties are too numerous to be brought before the court, when the case is subject to a special rule. Secondly. Where a person is interested in the controversy, but will not be directly affected by a decree made in his absence, he is not an indispensable party, but he should be made a party if possible, and the court will not proceed to a decree without him if he can be reached. Thirdly. Where he is not interested in the controversy between the immediate litigants, but has an interest in the subject-matter which may be conveniently settled in the suit, and thereby prevent further litigation, he may be a party or not, at the option of the complainant."

Williams v. Bankhead, 86 U. S. (19 Wall.) 563, 571, 22 L. Ed. 184.

Under the authority of Littlefield v. Perry, 88 U. S. (21 Wall.) 205, 22 L. Ed. 577, the alleged assignment (Plaintiff's Exhibit 2) is to be regarded as an assignment conveying to the plaintiff the entire right, title, and interest in the patent in suit subject to licenses in certain commercial fields, and vests in the plaintiff the legal title to the patent. See, also, Frankfort Whiskey Process Co. v. Pepper et al. (C. C.) 26 F. 336; Pope Mfg. Co. v. Clark (C. C.) 46 F. 789, 792; Lock Joint Pipe Co. v. Melber (C. C. A.) 234 F. 319; Sirocco Eng. Co. v. Monarch (C. C.) 184 F. 84; Sirocco Eng. Co. v. Sturtevant Co. (D. C.) 208 F. 147.

Therefore, I am of the opinion that the Elkon Works, Inc., is in a position to sue, and that the licensees in the limited fields, Radio Corporation of America, General Electric Company, and the American Telephone & Telegraph Company, which fields are not claimed to be invaded, are not indispensable as parties plaintiff.

Next, to be disposed of, is the alleged laches of the plaintiff urged by the defendant. The patent in suit, with the right to sue for and collect any damages for past infringement, was assigned to the Elkon Works, Inc., by the General Electric Company August 17, 1925. This defendant was formally notified by the plaintiff of its alleged infringement by letter of June 21, 1928, receipt of which was acknowledged by the defendant two days thereafter. The defendant contends that there had been open notorious "infringement" by many concerns from 1914 to 1925 without suit, notice, or protest on the part of the patent owner. The defense of laches is based not so much upon mere delay by plaintiff in bringing suit as upon the fact that plaintiff has permitted defendant to infringe and allowed the defendant to feel that it may safely do so without hindrance from the plaintiff, so that plaintiff is equitably estopped from prosecuting that defendant. Frank F. Smith Hardware Co. v. S. H. Pomeroy Co. (C. C. A.) 299 F. 544, 548. The attitude of the owner of the patent may be determined not only by a treatment of a particular alleged infringer but by its treatment of infringers in general.

Without going into detail in this already long opinion, but after consideration of the history of each of the infringers, it appears that when this defendant entered the field two other infringers had been enjoined; two others had retired from business; another

was in the process of taking out a license under the patent in suit, and the only other infringer of importance was the company which manufactured the contacts for this defendant. As late as the summer of 1924, this defendant was selling the tungsten contact points which it was purchasing from the Elkon Works of the General Electric Company of which the plaintiff is the successor. In so far as the defendant itself is concerned, it appears that there was therefore an interval between the summer of 1924 and September 22, 1926, in which the plaintiff refrained from bringing suit, if it be assumed that during this entire period it was aware that defendant was infringing. Such a delay of two years does not constitute an equitable estoppel, and I think the defense of laches should be overruled. See Columbia Graphophone Co. v. Searchlight Horn Co. (C. C. A.) 236 F. 135; Vapor Car Heating Co. v. Gold Car Heating & Lighting Co. (D. C.) 296 F. 188, 200.

Relative to the defense of invalidity, the defendant contends that the statements of the patentee regarding the deterioration from use of platinum and platinum iridium contacts are incorrect, and urges that the patent in suit presents no new constructual features, but only the substitution of material, namely, tungsten in the place of platinum and platinum iridium, and that the plaintiff's contacts are inefficient in certain fields included within the scope of the patent.

The patent in suit has been held valid and infringed by Judge Campbell in a well-considered opinion in the case of Elkon Works v. Wellworth Automotive Corporation (D. C.) 25 F.(2d) 968, in which the record was substantially similar to that in the suit at bar.

It is also important to note that the plaintiff's tungsten contact is regarded by the trade and the public as being not only cheaper but superior to any other contact point for general use as evidenced by the fact that upwards of twenty five million of the plaintiff's contacts were being sold each year as early as 1918, while only a few hundred thousand platinum iridium per year were being sold.

The defendant offered in evidence in the case at bar numerous patents and publications for the purpose of showing the state of the art. Many of these were considered and discussed at length by Judge Campbell in the Wellworth Case. His disposition of them does not differ from my own, and there is no reason for again discussing them, and

I refer only to those which are newly presented; one group includes the following: Comptes Rendus, vol. 142, p. 425 et seq. (1908); Bulletin of U. S. Bureau of Standards, vol. 2, p. 319 (1906); Berichte Physikalische Gesellschaft, vol. 40, p. 3287 (1907); Principles of Inorganic Chemistry, H. C. Jones (1903); College Text Book of Chemistry, Ira Remsen (1908); Article by Dr. Stimmelmeyer (1909); British patent No. 21,503 of 1906 to British Thompson-Houston Company; British patent No. 23,499 of 1909 to British Thompson-Houston Company; Lehner's Translation of Moissan's LeFour Electricque (1903). These refer to the characteristics of tungsten, which one or the other of the authors or the patentee was at the time aware of, previous to Coolidge's invention, such as the melting point of tungsten, that it would oxidize if heated in the air, etc.; but even if the knowledge of all the then known characteristics or elements were combined, the result which Coolidge produced was far from being assured. Up to the time that Coolidge made his invention, tungsten was regarded as useless as a material for make-and-break contacts because it lacked the property of nonoxidizability; Coolidge discovered that it could be used and how for this purpose.

The application of Eldred, patent No. 1,130,077, filed January 25, 1910, and issued March 2, 1915, which was after the patent in suit had been issued, was copending with the patent in suit. It is apparently offered as evidence that the processes used in the patent in suit of welding tungsten discs to steel by use of copper had been employed in welding platinum to iron, but the patent in suit contains no claims relative to the processes, and, even if it be considered as coming within the exception referred to in Alex. Milburn Company v. Davis-Bournonville Co., 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651, it does not affect the question now under consideration, for it does not refer to tungsten. Eldred, a witness in behalf of the defendant, admitted that he and all interested in the art were searching for a substitute for platinum and had not been successful and believed that none could be secured.

British patent No. 18,053 of 1907 to Jahodi discloses a tungsten-thorium alloy and a process of mixing pulverized tungsten or molybdenum with thoria as a binding agent and carbon, and is apparently offered to support the contention which the defendant makes that there is a difference between a wrought tungsten contact and a contact com-

posed of 98 per cent. tungsten and a small percentage of thorium or thoria.

British patent No. 17,610 of 1908 to Siemens & Halske shows the existence of nickel-tungsten alloy containing varying percentages of nickel, and, like the British patent No. 18,053, are for consideration not so much on the question of validity of the patent in suit as in support of the contention of non-infringement.

United States patent to Whitney, No. 902,354, shows the use of tungsten and molybdenum and other metals as electrodes for arc lamps. It groups together titanium, molybdenum, tungsten, chromium, thorium, and uranium as all suitable for flaming arc electrodes. This patent discloses the use of tungsten in a non-oxidizing atmosphere under conditions quite different from those which might exist in the normal use of the tungsten contact of the patent in suit, and there is not a suggestion that Whitney had the remotest idea of the use of tungsten for make-and-break contacts.

The defendant has offered a number of patents and publications, but the effective dates of all of them are subsequent to that of the Coolidge patent, No. 1,098,907; therefore they should not be considered. Book by Consoliver, published in 1925; Humphries United States patent No. 1,229,960 of 1917; Yunck United States patent No. 1,422,019; Coolidge United States patent No. 1,082,-933; Laise United States patent No. 1,569,-095 of 1925; Nishimoto United States patent No. 1,201,611 of 1916; article by Fink of September, 1912; Weintraub United States patent No. 1,086,655; British specification No. 19,525 (1911) abandoned and open to the public May 26, 1912.

The Coolidge article in the Journal of Industrial Engineering & Chemistry of January, 1912, is offered as an anticipation of the patent in suit; but it appears from the testimony that Coolidge was in possession of his invention in August, 1911. This is definitely established by oral testimony supported by notebooks and charts. Furthermore, a comparison of the statements made in the article with the statements in the applications for the patent do not seem to me to be inconsistent as urged by the defendant. I think the statement in the specification relating to the oxidization of tungsten when subjected to high temperatures in the air and the nonconducting qualities of the oxide so formed is substantiated by the tests and evidence, and that, under normal working conditions, the nonconducting oxide of tungsten upon the contact points flakes off and is eliminated by being shaken off in the vibration of the contacts.

The defendant strongly urges that all that Coolidge did was to substitute one material for another, namely, tungsten for platinum. But in my judgment Coolidge's invention was not a mere substitution, as it appears from the weight of the evidence that tungsten, when used for a make-and-break contact in automobile ignition systems, both battery and magneto, withstands wear for a longer period than platinum or platinum iridium, and produces superior results, particularly in battery ignition systems, the evidence in the case at bar being confined to these; and tungsten is much less expensive than platinum.

Judge Campbell in the Wellworth Case found that tungsten contacts had a virtue not possessed by platinum, in that the accidental wetting with oil interfered with the operation of platinum contacts and was beneficial to the operation of tungsten contacts, but the evidence in the case at bar differs from that of the Wellworth Case in this respect. and does not support that conclusion. The history of the development of make-and-break contacts is replete with efforts covering a period of years to find an efficient make-and-break contact for ignition system and one made of less expensive metal than platinum and platinum iridium, and it was not until Coolidge invented his contact point, now being attacked for lack of invention, that the problem was solved; its very great commercial success is a recognition of its value.

Bearing in mind the state of the art and the demand for a new make-and-break contact which existed in the years previous to Coolidge's invention of the tungsten contact, I think it is quite evident that the use of tungsten for this purpose instead of platinum and molybdenum was not an obvious step, and that what he accomplished is to be regarded as an invention. I am in accord with the result reached by Judge Campbell in the Wellworth Case, and think that such conclusion is supported by the decisions in the Tungsten Filament Cases,[1] including General Electric Company v. Laco-Philips (C. C. A.) 233 F. 96 and others cited by Judge Campbell.

[1] General Electric Co. v. Alexander (D. C.) 277 F. 290, affirmed (C. C. A.) 280 F. 852; General Electric Co. v. P. R. Mallory & Co. (D. C.) 286 F. 175 (preliminary injunction [D. C.] 294 F. 562, final hearing), affirmed (C. C. A.) 298 F. 579; General Electric Co. v. Minneapolis Electric Lamp Co. (D. C.) 10 F.(2d) 851.

The contact points sold by the defendant are like those of the plaintiff in structure, but, instead of using all tungsten, the tungsten is alloyed with vanadium and thorium or thoria in one of the types of its contacts, and in its other type the tungsten is alloyed with nickel. Defendant conceded that the presence of thorium in the tungsten vanadium thorium alloy served no good purpose, and the evidence is that it debases tungsten as a contact material and diminishes its efficiency.

British patent No. 535 of 1912 to the British Thompson-Houston Company, Limited, offered by the defendant and marked Defendant's Exhibit K(I) for identification, is not received in evidence as being of too late in date to be effective as an anticipation and not available as an admission against interest. Exception to the defendant.

My conclusion is that the patent is valid; that all its seven claims have been infringed; and that the plaintiff is entitled to a decree with an injunction and with the usual reference as to damages.