HARTFORD–EMPIRE CO. et al. v. DEMUTH GLASS WORKS, Inc.

No. 8023.

District Court, E. D. New York.

June 11, 1937.

Frank C. Cole, of New York City (Vernon M. Dorsey and Alan F. Garner, both of Washington, D. C., of counsel), for plaintiffs.

Kenyon & Kenyon, of New York City (Theodore S. Kenyon and W. Houston Kenyon, Jr., both of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is a suit for the alleged infringement of patent No. 1,574,736, issued to Karl E. Peiler, assignor by mesne assignment, to Hartford-Empire Company for feeder for molten glass granted February 23, 1926, on application filed August 3, 1912.

The patent in suit issued to the plaintiff Hartford-Empire Company, and its title is not questioned.

By a license agreement executed June 26, 1928 (Ex. 4), the plaintiff Hartford-Empire Company granted to Corning Glass Works, an exclusive, assignable and divisible license to make and sell apparatus and to use or license others to make, sell, or use the invention covered by the patent, but provided that it "is restricted to the use of the apparatus made under this license and of the process hereby licensed for the manufacture of tubing and/or cane from molten glass."

The Corning Glass Works, the licensee in said license agreement, has, since its execution and since the filing of this suit, been merged under the laws of the state of New York, with the Macbeth-Evans Glass Company under the same corporate name, Corning Glass Works (Ex. 5), and the new corporation has been substituted for the old company, by a suppemental bill. This merger conveyed to the new corporation all the assets of the old company, including equitable rights, such as licenses under the patents, owned by the old corporation. Section 85 of the Stock Corporation Law of New York (Consol.Laws N.Y. c. 59); Edison Electric Light Co. v. New Haven Electric Co. (C.C.) 35 F. 233, 236; Edison Electric Light Co. v. United States Electric Lighting Co. (C.C.A.) 52 F. 300, 313, 314.

The Corning Glass Works (old corporation) granted an exclusive license for tubing and cane of certain kinds, but other than for electrical purposes, to Libbey Glass Company (Ex. 6).

As this suit is based on the sale by the defendant, of tubing and cane made on the alleged infringing machine for use for electrical purposes, the Libbey Glass Company has not been made a party. P. R. Mallory & Co., Inc. v. Automotive Mfrs' Outlet, Inc. (D.C.) 45 F.(2d) 810.

The alleged infringing act being the use of the patented device in the manufacture of tubing and cane, the Hartford-Empire Company is only a nominal plaintiff, the Corning Glass Works being the real plaintiff.

Defendant denies infringement, denies that its machine embodies any invention disclosed in the patent in suit as filed, or in the patent as issued, denies any equivalence between its machine and the patent in suit in structure, mode of operation or result, and denies that the machine of the patent in suit, if operable at all, could achieve the defendant's results. Defendant asserts that the patent in suit is a mere paper patent, that it has never been commercially used, and has contributed nothing of value to the practical art, that, if it is valid at all, it must be limited to the separate gob feeding device it describes, and is not infringed.

Defendant further asserts that, if the claims in suit are so broad, as to cover the Danner machine, they are invalid, (1) because broader than the disclosure of the patent in suit, (2) because they have been illegally broadened to cover the Danner machine by amendment filed more than two years, i. e., nearly nine years, after the issuance and publication of the Danner patents, and (3) because the assertion of a monopoly of such scope is unsupported by any supplemental oath by the patentee of the patent in suit.

Defendant further asserts that the bill should be dismissed because, (1) the claims in suit are not infringed; and (2) they are invalid if so broadly construed as to cover defendant's machine.

The defendant is a glass manufacturer located in the borough of Brooklyn in this district.

The machine alleged to infringe is a device for making glass tubing and glass rod, built and operated by the defendant since the expiration of certain Danner patents.

Prior to their expiration, the plaintiff was the owner of exclusive rights under those Danner patents.

Defendant further contends that this suit is an attempt to prolong the monopoly that plaintiff enjoyed under the Danner patents for the additional term of the patent in suit.

Glass melted in a furnace at a temperature of 2200° F. or over (at which temperature it is very fluid) must for fabrication be taken therefrom to be worked outside the furnace at the much lower temperature at which it is fabricated. The old method of doing this was the hand punty method in which an iron called the punty is inserted in the furnace with its end just immersed in the molten glass and rotated to collect thereon a layer of glass, the glass sticking to the iron by adhesion. A sufficient quantity of glass having been collected, the iron with the adhering glass is withdrawn from the furnace, the iron during such withdrawal being rotated to hold the glass thereon.

The glass so withdrawn from the furnace may be fabricated in several ways, the iron being used to position it for such fabrication. If a hollow article is to be made, the punty is hollow.

The iron may be held in inclined position and its rotation stopped to permit the glass to run off the side of its end into a mold, after which the connecting strand of glass is cut, or the iron may be held erect to let the glass run down off its end, air being blown through the iron to expand the glass as it runs off the pipe into a hollow article.

A cane or tube can be produced by drawing the glass off the punty, air being admitted through the pipe, if tubing is to be produced, it being common practice to rotate the punty during this operation to produce uniform walls.

Whichever of these methods is followed, the punty method suffers from the serious fact that time must be consumed between successive fabricating operations in reloading the punty, requiring the service of a skilled workman.

Many attempts had been made prior to the filing in 1912 of the application for the Peiler patent in suit, to depart from this practice. Mr. Carter enumerated two methods which had gone into public use, that is, the flowing stream or Brooke method and the Owens suction method. Since 1912 the plunger feed method, invented by the patentee of the patent in suit, has gone into extensive use. See Hartford-Empire Co. v. Hazel-Atlas Glass Co. (C.C.A.) 59 F.(2d) 399.

The patentee of patent 1,574,736 in suit says, in his specification, "I * * * have invented new and useful improvements in Feeders for Molten Glass * * *," and further says "The invention to be claimed herein comprises an inclined rotating member, preferably contained in a heated chamber, on which glass is fed in a stream from a suitable source of supply, and from which it is delivered for subsequent working."

In his said invention the patentee utilizes the flowing stream feeding method to provide a continuous feeding of glass from the furnace, and like the hand punty method to collect the glass by winding it on a punty. This he accomplished by locating a rotating punty outside of the melting compartment and fed it by a stream of glass continuously flowing from the furnace upon the upper surface of the punty.

The operation is properly described by the witness Carter as follows:

"The glass is run out of the furnace in a continuous stream, but interposed between this stream and the parts which have to do with the fabrication of the glass

is an instrumentality which is very similar to an ordinary hand punty, except that it is on a larger scale and it is in fixed position. It is inclined downwardly and has a head on which the stream flows and about which the glass is wound up, very much as the hand punty gatherer winds it up on his punty or blowpipe, but by supplying it with a continuous stream of glass, instead of requiring the punty to be put into the furnace and wound up with the glass there, the operation is made continuous, that is, the gathering of glass upon the mechanical punty takes place as a continuous operation. The stream flows continuously upon it, and the glass is carried off, in some form or other, in toto, at the exact rate that it is supplied, that is to say, the amount of glass taken off from the punty in a given interval of an hour or any substantial interval of time, is necessarily the same rate as that which it is supplied by the flowing stream.

"The punty does two things here, it receives the flowing stream and distributes it and amalgamates that stream so that the coiling and lapping which I have referred to as inherent in the ordinary flowing stream method is overcome. The glass stretches itself over the surface of the punty which is in a heated chamber and the tendancy of the skin to interfere with its homogeneity is overcome and it becomes again a homogenous mass."

The defendant pleaded patents as anticipating, but its expert discussed but one of them, which I must assume he considered the most pertinent and the best reference, to wit patent to Mansfield 854,511 granted May 21, 1907. That patent shows a glass melting chamber having an opening in one of its vertical walls closed by a pair of superimposed, water cooled metal feed rolls, the rolls having circumferential grooves therein so that the upper rear quadrant of the lower roll and the lower rear quadrant of the upper roll form parts of the wall of the melting chamber. No accumulation of glass on either roll is contemplated and there is no disclosure of the flowing of glass onto either roll. One quadrant of each roll is immersed in the glass in the melting chamber, and a stream of glass is neither wound nor gathered on either roll. If that device were operative at all, the rolls would merely squeeze out a column of glass between them.

The only prior art offered in evidence neither anticipates nor limits the construction of the patent in suit.

Defendant pleaded invalidity because of alleged unreasonable delay in making the claims in suit until more than two years after the patenting of the Danner machine in 1917 and the use thereof in 1920.

This defense appears to be without merit.

Original claim 9 reads as follows: "9. A feeder for molten glass comprising a rotatable gathering head, means for rotating said head, and means for supplying molten glass to the said head."

On February 15, 1915, claim 9 as above quoted was canceled and the following inserted as claim 3: "A feeder for molten glass, comprising a rotatable gathering head, means for rotating said head and means for flowing molten glass upon said head."

On March 10, 1915, claim 3 as inserted on February 15, 1915, was amended.

Original claim 18 reads as follows: "18. In feeders for molten glass, the combination of a rotary gathering head, means for supplying molten glass to the head, and means for heating said head."

On December 10, 1913, claim 18 above, was slightly amended.

On February 15, 1915, claim 18, above quoted, was, by further amendment, put into the present form of claim 6 of the patent.

On October 18, 1915, a supplemental oath was filed covering all changes made by previous amendments.

It thus appears that claim 6 here in suit was made in the application for the patent in suit, in exactly its present words, in 1915, which was prior to any possible relevant date as to Danner, and that the claim has since been continually in the application and in the patent.

The application was involved in interferences from January 18, 1918, until October 27, 1925, when the last one was terminated. During all of this time, the application for the patent in suit was not open for prosecution by way of amendment.

On October 27, 1925, after the termination of the last interference the patentee of the patent in suit filed amendments.

No change in the specification or addition of other claims has varied the meaning of this claim 6 from what that meaning was

in 1915 and the meaning is just the same today, as it was in 1915.

If claim 6 be compared with claims 3, 8, and 12, it clearly appears that the claims in suit were not broadened long after the Danner patent had issued, as neither claim 6 nor any of the other claims in suit, when read in the light of the amended specification, have any different meaning or different scope than when read in the light of the original specification.

Defendant's assertion that Peiler should have earlier asserted broader claims during the interference, if he wished to make them, seems to me to be without point, as claim 6 is a very broad claim, and this would be especially true, if he already had claims reading on defendant's structure.

No supplemental oath was filed by the patentee after October 18, 1915, and none was required, as claim 6 had by that time been put into the form in which it issued into patent and there has been no broadening of the scope of the application either since the Danner patent issued in 1917, or after the Danner machine went into public use in 1920, and the claims were not broadened after October, 1925, and no supplemental oath was required.

Claims 8 and 12, which are more restricted claims, were not in the application in October, 1915, but no supplemental oath is necessary to support restricted claims.

The claims in suit of the patent in suit are valid.

Claims 3, 6, 8, and 12 of the patent in suit read as follows:

"3. A feeder for molten glass, comprising a rotatable gathering head, means for rotating said head, and means for flowing molten glass upon said head, while rotating, whereby a layer of glass is accumulated around the head."

"6. In feeders for molten glass, the combination of a rotary gathering head, means for supplying a constant flow of molten glass to and winding it around the head, and means for heating said head and its accumulating glass."

"8. In feeders for molten glass, the combination of a conduit for flowing molten glass, a rotary gathering head disposed in contact with the flow of glass, means for rotating the head to gather an accumulation of the flowing glass, and heat-retaining walls covering the conduit and laterally surrounding the head to confine the heat of the glass thereto."

"12. In combination, a container for molten glass, a channel conducting and discharging the glass from said container, said channel having a discharge lip over which the glass flows in a continuous stream, a vertically movable gate for controlling the flow of glass through said channel, a rotatable implement arranged to receive and wind the said stream of glass, said implement being mounted rotatably in a bearing and being inclined downwardly from said bearing to a free lower end, and an enclosure surrounding said implement and adapted to heat the glass upon said implement."

The defendant's machine is a device for continuously forming, drawing, and cutting glass tube or rod from a supply of molten glass. Molten glass flows in a continuous stream from a melting furnace 10 through channel 13, thence it falls on receiver 17 and runs down apron 19 into a trough 18. Trough 18 is positioned within a heated forehearth maintained at a high temperature by burners 25. From trough 18 the molten glass flows in a continuous stream through spout 23 and from the lip thereof falls upon a continuously rotating mandrel within enclosed auxiliary furnace chamber which is maintained at a temperature of approximately 1850°F.

The mandrel is formed of ceramic or refractory material, and is about 8 inches in diameter and 2½ feet long; it is supported upon a hollow shaft which is adjustably inclined downwardly at an angle of about 25° from the horizontal; and is provided with driving means for rotation at constant speed. In ordinary practice, defendant's mandrel operated at a speed of approximately 5 r.p.m.

The glass flows upon the rotating mandrel near the upper or more elevated end thereof, and is wound around the same to form an axially moving cylinder or sheath of molten glass upon the mandrel.

This sheath slips or glides slowly down the mandrel at a constant rate of speed toward the lower or free end thereof under the influence of gravity and the pulling mechanism hereinafter referred to. Near the point where the glass falls upon the mandrel the surface of the glass sheath is not smooth, but contains spiral laps or ropey winds. The mandrel is made relatively quite long, and is revolved in an enclosed auxiliary heating furnace, provided with a bottom burner which maintains the temperature along the mandrel at about

1850°F., so as to give ample opportunity for these laps and ropey winds to be ironed out and eliminated, before the sheath of glass comes to the free lower end of the mandrel where the tubing is drawn.

At the free lower end of the mandrel, the cylinder of glass is drawn off in a direction substantially in line with the axis of the mandrel by the pull of the drawing machine. If tube is being made, air under low pressure is blown through a central pipe in the mandrel, otherwise solid rod is produced.

The glass is drawn away from the discharge end of the mandrel at a constant rate of speed. The flow of glass to the mandrel is always equal to the flow of glass from the mandrel; there is no change at any time during operation in the quantity of glass upon the mandrel.

The tube or rod drawn off the end of the mandrel passes out of the furnace and into the open air, where it cools rapidly passing over a series of rollers toward the drawing and cutting mechanism. The tube or rod is continuously drawn along and over these rollers by the drawing and cutting mechanism positioned approximately 140 feet distant from the mandrel. The drawing and cutting mechanism comprises (a) two endless power-driven belts which engage the glass tube or rod on opposite sides thereof and draw it forwardly at a predetermined constant speed toward a cutting station, and (b) cutting mechanism mounted upon a reciprocating carriage which moves forwardly at the same speed as the glass tube or rod delivered by the belts, causes a section thereof to be scored and then broken off while so moving and then returns to its starting position to repeat the scoring operation after passage of a predetermined length of tube or rod. When the tube or rod is cut into lengths it is sufficiently cool to be handled.

Before entering into any comparison of the structure of the patent in suit, and the defendants', we should not lose sight of the fact that the patent in suit was on a glass feeder, that the elements of the claims are feeder elements, that the claims do not include any elements of the machine to which the glass is fed, therefore, it is immaterial to the issues in this case whether the feeder supplies a machine for making pressed glassware, or a drawing and cutting machine for making cane or tubing.

Plaintiff contends, and I think properly, that the claims in suit of the patent in suit are broadly on the combination of a glass melting chamber and a rotating punty outside of the chamber, onto which glass flows continuously from the chamber in which it is melted and on which it is conditioned for subsequent treatment.

The feeder supplies the glass to the machine that is to operate on the glass and in shaping the glass. Different types of feeders may be used for feeding the same type of machine and the same type of feeder may be used for feeding different types of machines.

The issue here presented is whether the feeder used by the defendant infringes the claims in suit, which are upon the feeder of the patent in suit, and not whether defendant's tube drawing and cutting machine is different from the glassware forming machine of the patent in suit.

Infringement is not escaped by the fact that the use of the feeder charged to infringe is a different use from that described for the feeder in the patent in suit.

A patentee is entitled to all the uses and benefits of his invention, whether or not he contemplates them, or knows of them. Deitel et al. v. La Minuette Trading Co. et al. (C.C.A.) 37 F.(2d) 41; Reinharts, Inc., v. Caterpillar Tractor Co. (C.C.A.) 85 F.(2d) 628; Radio Corporation of America et al. v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163; Lyon et al. v. Boh et al. (C.C.A.) 10 F.(2d) 30; Radio Corporation of America et al. y. Andrea et al. (D.C.) 15 F.Supp. 685; Marconi Wireless Telegraph Co. of America v. De Forest Radio Telephone & Telegraph Co. (D.C.) 261 F. 393.

The claims in suit are not limited to the type of rotation of the punty, and it makes no difference on the question of infringement whether the punty is intermittently rotated when the feeder is used for forming mold charges, or whether it is continuously rotated when forming tubing.

Shears are not an element of the claims in suit, and their presence or absence is of no moment.

Neither intermittency or cutoff is included in the claims of the application as filed from which the claims in issue are derived.

The feeder elements of the patent in suit are claimed without restriction of use.

The punty, substantially as disclosed in the patent in suit, and as originally claimed

therein, if adjusted to rotate without interruption, or if adjusted so that the interruption is not too long, is an operative feeder from which tubing and cane can be drawn.

The patented feeder as claimed by the claims in suit of the patent in suit, and the functions thereof, end with the accumulating and conditioning of the glass on the punty, and do not include the succeeding steps of fabricating the glass which are in the field of the divisional patent 1,773,544.

It seems to me that nothing is to be gained by discussing, as does defendant, features which bear not upon a "glass feeder" but upon the handling of the glass after the feeding has been finished. I will, therefore, briefly discuss defendant's contentions as to those parts of the brief which bear on the feeding problem. The first has to do with heat conditions. Defendant makes a point of the alleged lack of heat around the punty of the patent in suit. No particular type of heating arrangement is required to comply with the claims in suit. Claim 3 does not include the heating as an element. Claim 6 recites "means for heating said head and its accumulating glass." Claim 8 calls for heat retaining walls covering the conduit and laterally surrounding the head to confine the heat of the glass thereto. Claim 12 defines the heating as "an enclosure surrounding said implement and adapted to heat the glass upon said implement." The heating means in claim 6, 8, and 12 apply to the heating means of the defendant's Danner machine.

The maintenance of a high temperature around the punty is set forth at page 3, lines 44 to 61, of the patent in suit as follows: "It is considered preferable to provide a hood and gas jets, or other means, for heating the interior of the hood as herein shown, since this prevents undue chilling of the glass drop or gather, maintaining it in uniform plastic condition. It also serves to prevent undue chilling of the attenuated neck of the drop, and serves to keep hot or to reheat the remaining thread of glass left by the severing operation. The shear device may be of any suitable kind, and its blades may be protected from the heat when in their open or inactive position by means of shields of suitable refractory material. Or the shear blades may be opened wider or withdrawn during their inactive period far enough from the head to avoid being over heated."

The gas jets referred to are in addition to the gas jet 17 shown in the drawing and referred to on page 1, line 70, of the specification.

The teaching of the patent in suit above quoted is accomplished by the device shown therein, even without the addition of the extra burners referred to above.

Mr. Schwartz contends that there is not sufficient heat below the spout in the patent in suit to do the heating that is required in the special furnace of the defendant's apparatus.

This contention was not sustained.

In the forehearth, in Fig. 2, of the patent in suit, the floor of the glass channel terminates at a point away from the front wall of the hood, so that the lip 3 is directly over the punty. This leaves an opening between the interior of the furnace and the punty chamber. The front wall of the punty chamber is shown in Fig. 2 as extending down to at least about the level of the lower part of the punty. The side walls of the chamber extend even farther down and heated gases, especially from burner 17, flow down between the lip 3, and the projecting front wall of the furnace in direct contact with the punty and into the forehearth in which the punty is contained. These hot gases are confined within the punty chamber, and escape under the lower edge of the inclosing walls.

It does not seem to me that defendant's attempt to differentiate its construction from the patent, by reason of the fact that defendant claims to have a long tapered mandrel while the punty of the patent in suit is pictured as spheroidal, requires extended consideration.

The action on either the punty of the patent in suit, or the defendant's mandrel, is a controlled reduction in temperature from that of the stream delivered to it. The punty is run in the production of tubing at a lower temperature than the longer mandrel, but it results in the smoothing out of the glass.

No particular shape of punty is called for by the claims or specification of the patent in suit, in which the patentee says: "The size and form of the gathering head 14, the angle of inclination of its axis, and the rate, direction and variance of its rotation may be modified to suit different requirements." Page 3, lines 62–66.

Shape not being essential the defendant cannot escape infringement by using a device of a different shape. Consolidated Safety Valve Company v. Crosby Steam

Cage Valve Company, 113 U.S. 157, 5 S. Ct. 513, 28 L.Ed. 939; Flintkote Co. v. National Asbestos Mfg. Co. (C.C.A.) 52 F.(2d) 719, 721; Stearns-Roger Mfg. Co. v. Ruth (C.C.A.) 62 F.(2d) 442, 448; Winans v. Denmead, 15 How. 330, 342, 14 L.Ed. 717.

That the diameter of the punty at Glenshaw was 2½ to 3 inches and that of the defendant's mandrel was 8 inches, is not of moment on the question of infringement, as the rate at which the glass is to be delivered therefrom will control the selection of the diameter of the punty.

Even Mr. Schwartz said "it is undoubtedly true" that defendant had a smaller mandrel. Mandrels like defendant's, but having a diameter of from 3 to 10 inches, may be used, and these sizes have been used at Corning. The size of the punty is not an element of the claims and is not essential.

It is true as contended by defendant, that the patent says: "For all purposes now contemplated it is considered permissible and preferable thus to entirely interrupt the rotation of the gathering head * * *"; but we must not lose sight of the fact that the specific embodiment shown in the patent was a feeder for molds, where such interruption is desirable. This statement also carries the implication that for purposes other than mold feeding it would be permissible not to interrupt the rotation of the gathering head. The knowledge or lack of knowledge by the patentee at the time of any particular advantage flowing from continuous rotation does not control the scope of the invention, as the patentee is entitled to all uses of his invention, whether contemplated by him or not, as I have hereinbefore stated, and cited authorities.

That the draftsman in Fig. 16 pictured the slot a small fraction of an inch too short to permit a continuous rotation of the punty does not seem to me to be important, as it seems to me that such a showing is a purely accidental thing and that the slot was no more than a diagramatic representation of a means of adjustment. There would be no difficulty in making the slot longer if continuous rotation should be desired. The fact that the patentee mentioned the possibility of reversal of the punty, which could not be done, with the drive shown, shows that he did contemplate the possibility of other forms of drives. That the patentee had these things in mind, when, in speaking of the gathering head in his specification, he said: "The rate, direction and variance of its rotation may be modified to suit different requirements. The other features of the invention may also be modified and varied in size, proportion and disposal relative to each other to suit different circumstances or conditions of service."

A comparison of original claims 9 and 16 shows that the patentee contemplated and asserted his right to cover continuous rotation in that those claims were identical except that claim 9 called for "means for rotating the said head" and claim 16 called for "means for intermittently rotating said head."

The claims in suit are not limited to intermittent rotation.

Claims 3 and 8 call for "means for rotating said head."

Claim 6 calls for "a rotary gathering head."

Claim 12 calls for "a rotatable implement."

The patentee of the patent in suit was the first to combine the flowing stream method and the punty gathering method by flowing a stream of glass continuously out of a molten glass container onto a revolving punty outside of the chamber to form a coating of glass around the punty, temporarily retained thereon by adhesion, therefore, the feeder of the claims in suit was new with the patentee of the patent in suit. The claims in suit are not limited by the prior art, and, therefore, must be taken as meaning what they say, and no limitations should be read therein by construction.

Defendant contends that the patent in suit is a paper patent, and has never been commercialized. This contention has not been sustained. It is true that the particular structure shown in the drawings of the patent in suit may not have gone into commercial use, but the invention of the patent in suit has gone into extensive commercial use, as those operating the Danner machines at the time of the issuance of the patent in suit, with the exception of the defendant, are licensed under the patent in suit. Such licenses were not secured by the payment of small consideration, but by the payment of substantial sums; the Corning Glass Works having paid the $150,000 to the Hartford Empire Company for its license, the General Electric Company having paid to Corning Glass Works $160,000.

for its sublicense, and the Libbey Glass Company having paid to Corning Glass Works $87,500 for its sublicense.

The taking of these licenses at large expense by the owners and operators of the Danner machines shows that they recognized the patent in suit as controlling the Danner machines.

■ The patent in suit is a generic one, unlimited in scope by prior art or by specific limitations in claim phraseology, and there is no doubt as to the validity of the patent, therefore, there is no ground for confining the claims to the device shown and described. Hildreth v. Mastoras, 257 U.S. 27, 34, 42 S.Ct. 20, 23, 66 L.Ed. 112; Mergenthaler Linotype Co. v. Press Pub. Co. et al. (C.C.) 57 F. 502, 505, 506; General Electric Co. v. P. R. Mallory & Co., Inc. (D.C.) 294 F. 562; Continental Paper Bag Company v. Eastern Paper Bag Company, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122.

■ Even a paper patent, except in cases of doubt, as to validity is entitled to the same treatment as any other patent, in respect to its scope and its proper range of equivalents. Fox Typewriter Co. v. Corona Typewriter Co. (C.C.A.) 282 F. 502; Byers Mach. Co. et al. v. Keystone Driller Co. (C.C.A.) 44 F.(2d) 283, 285.

■ The claims in suit read on the defendant's device, both literally and in substance, and in both the defendant's device, and the patent in suit, we find in the terms of claim 12, the most restricted claim in suit, in combination, using for the purpose of designation, the reference numerals applied to parts of the patent in suit, "a container (2) for molten glass, a channel conducting and discharging the glass from said container, said channel having a discharge lip (3) over which the glass flows in a continuous stream, a vertically movable gate (5) for controlling the flow of glass through said channel, a rotatable implement (14) arranged to receive and wind the said stream of glass, said implement being mounted rotatably in a bearing (16) and being inclined downwardly from said bearing to a free lower end, and an enclosure (9) surrounding said implement and adapted to heat the glass upon said implement."

The elements recited in claims 3, 6, and 8 are also found, with additional ones, in claim 12 above, which is the most restricted claim, and therefore, it is not necessary to here read them on the structures of the defendant and the patent in suit.

The broad novelty of the invention of the patent in suit prevents anything being imported into the claims by the term "gathering head" other than what is fairly and properly necessary to constitute the head, a gathering one. So construed, the defendant's mandrel is a gathering head, as the flowing stream of glass in defendant's structure does get onto the head, and is gathered and accumulated thereon. Quite a body of glass is gathered on the mandrel of defendant's machine, and is accumulated on the mandrel by winding thereon, and no longer flows freely through the heated forehearth, but by its gathering and accumulation is delayed for treatment within a heated zone.

The matter canceled from the specification at the time the claims combining the punty with intermission and shears were canceled did not change the meaning of the claims, as the patent contains every essential statement of fact contained in the matter canceled from the specification, and describes the same structure and ascribes the same mode of operation thereto as does the canceled matter. No claims of the patent in suit relate to intermittent rotation or severing, and the canceled matter did not fit such a patent.

There cannot be read into the words "gathering head" as used in claims 3 and 6 a limitation of every point, feature, and function ascribed to the gathering head at any place in the patent.

In the patent in suit the word "accumulating" is used in the sense of building up. In the Danner machine there is only the accumulating but not the periodic discharge. The accumulating on the mandrel is not only at the start of the operation, the glass is accumulated on the mandrel all the time, it flows, steadily on, accumulating.

The defendant contends that the "Patent Office has expressly ruled that the disclosure of the patent in suit, will not support claims to continuous rotation, because the disclosure is solely of intermittent rotation." That ruling was not made in the application for the patent in suit, but in the application for the later Peiler patent No. 1,773,554, and occurred after the issuance of the patent in suit. The only question presented here is whether the patentee of patent in suit is entitled to claim, as he did claim, rotation of the punty broadly, so that his protection extends not only to a

punty rotated intermittently, but also to one rotated continuously. The patentee was not restricted by the art and he availed himself of the privilege, to which he was entitled, in the claims of the patent in suit. What happened in the later Peiler divisional patent does not control or limit the patent in suit, which is an earlier one, nor does the interpretation that should be placed upon the claims of the later divisional Peiler application affect the claims here involved.

The claims here in suit cannot be limited to arrest a rotation of the punty or to shearing action or to the formation of severed charges as that would make them identical in scope with claims of the second Peiler and the rule of claim differentiation excludes such limitations. Automatic Recording Safe Co. v. Burns Co. (C.C.A.) 231 F. 985; Witherow Steel Corporation et al. v. Donner Steel Co., Inc. (D.C.) 31 F.(2d) 157, 166; Ryder v. Schlichter (C.C.A.) 126 F. 487, 491.

Claims 3, 6, 8, and 12 of the patent in suit are valid and infringed.

A decree may be entered in favor of the plaintiff against the defendant with injunction and costs and the usual order of reference.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court as provided by rule 70½ of the Equity Rules (28 U.S.C.A. following section 723) and rule 11 of the Equity Rules of this court.